AKRON MILK PRODUCERS, INC., APPELLEE, *v.* ISALY DAIRY CO., APPELLANT.*

(No. 4836—Decided January 21, 1959.)

*Motion to certify the record overruled, September 6, 1959.

156

*Messrs. Buckingham, Doolittle & Burroughs* and *Mr. Stuart H. Russell,* for appellee.

*Mr. Roger Gilroy* and *Messrs. Hershey, Hatch, Browne & Wilson,* for appellant.

DOYLE, J. This is an appeal from a judgment of the Court of Common Pleas of Summit County, rendered pursuant to a jury's verdict for $9,569.91, with interest, in favor of Akron Milk Producers, Inc., and against the Isaly Dairy Company.

Akron Milk Producers, Inc., is an Ohio corporation engaged in the business of operating, through its officers and employees, a milk producers' co-operative association for the collecting, testing and marketing of milk for approximately 1500 farmer-members in the Akron area. The Isaly Dairy is also an Ohio corporation, and, in the course of its business, collects, buys, processes, bottles and sells milk to the general public.

· During the period of time in which the events, to be later mentioned, occurred, all dairy farmers who shipped milk to the Isaly Dairy Company were members of the Akron Milk Producers, Inc.

For convenience, the two corporation litigants shall be hereinafter called "Producers, Inc.," and "Isaly." The former was the plaintiff in the trial court, and is the appellee here; the latter was the defendant, and is the appellant here.

The petition alleged that on or about January 5, 1957, Producers, Inc., entered into a contract with Isaly, and other milk bottlers and retail sellers in this area, which established the terms and conditions for the sale of milk produced by members of its association to Isaly and others for a period of time from January 1, 1957, through July 31, 1957.

It was further pleaded that the contract provided that Isaly would pay, for each 100 pounds of milk testing 3.5% butter fat, on the following scale:

For the month of January, 1957, the basic formula price established pursuant to the Federal Milk Marketing Order and Agreement No. 60, plus $1.80; from February 1, 1957, through July, 1957, the basic formula price established pursuant to the Federal Milk Marketing Order and Agreement No. 60, plus $1.70.

It was further charged that, during the month of January, Producers, Inc., delivered, and Isaly accepted and paid for, 707,370 pounds of milk, on the basis of the price in the contract; that thereafter Isaly refused to pay, for milk which it accepted, in compliance with the contract price.

It is here noted that the marketing of milk was, at the time of the claims herein asserted, subject to Milk Marketing Order and Agreement No. 60, issued by the United States Department of Agriculture. Under this order and agreement, all persons or organizations who processed raw milk for sale to the public were required to pay to the producers (the dairy farmers) the prices established under the Federal Milk Marketing Act. The price established under the act was minimum only. Nothing in the law prohibited the payment, or a contract for payment, of an amount higher than the minimum price set by federal order.

Isaly admitted that it paid for milk delivered in the month of January, on the basis alleged by the plaintiff—*i. e.,* formula price established by the federal order and agreement, plus $1.80 —but it denied that it agreed to pay for the milk supplied during the month of February, and on through July, 1957, on the basis of a price computed by adding $1.70 to the basic formula price.

Contrary to the claim of Producers, Inc., Isaly pleaded that it agreed to pay the minimum-order price established pursuant to the Federal Milk Marketing Order plus $1.70, only so long as the retail sale price of milk did not drop in amount. Allegation was further made that, on February 16, 1957, the retail price of milk did drop; and that, under the terms of the agreement, it paid a premium of $1.70 for all milk supplied for the first 15 days of February, 1957, and thereafter, paid the price established by the Federal Milk Marketing Order and Agreement No. 60, in accordance with its agreement with the plaintiff.

The case was submitted to the jury on the theory of contract. It had for determination the question of fact as to whether the testimony of the witnesses for Producers, Inc., established its version of the terms of the agreement on price, or whether such testimony was sufficiently rebutted by the testi-

mony of the witnesses for Isaly, who affirmed the claims made in the answer. It was stipulated by the litigants that the amount of money in controversy, calculated from the number of pounds of milk furnished to and received by Isaly during the period, was $9,569.91. From the verdict of the jury, it is obvious that it found the agreement to have been as claimed by Producers, Inc.

We find from the record that this conclusion of the jury is not manifestly against the weight of the evidence; and the judgment must stand, unless other error intervened sufficient in character to require a reversal of the judgment.

Isaly, the appellant, claims error in the following respects:

"1. The trial court erred in overruling defendant's motion for a new trial.

"2. The trial court erred in admitting evidence over the objection of the defendant, particularly plaintiff's exhibits 1 to 8 inclusive.

"3. The trial court erred in overruling defendant's motion for a directed verdict.

"4. The trial court erred in its general charge to the jury, particularly with respect to plaintiff's exhibits 1 to 8 inclusive, and with respect to the alleged contract between appellant and appellee.

"5. The verdict of the jury is manifestly against the weight of the evidence.

"6. The verdict of the jury is contrary to law."

Isaly stresses the claim that there was no contract obligating it to pay Producers, Inc., premium amounts over and beyond the price set by the federal order. It asserts that "there is nothing in the petition or the record of testimony whereby the appellee [Producers, Inc.] and its members were obligated to sell, or the appellant [Isaly] to buy, any particular stipulated volume of milk from the appellee or its members; nor is there any evidence whereby the appellant agreed to satisfy its milk requirements through purchases from the appellee or its members."

The statement by Isaly that "there is nothing in the petition or the record of testimony whereby the appellee and its members [Producers, Inc.] were obligated to sell, or the appel-

lant [Isaly] obligated to buy, any particular stipulated volume of milk from appellee or its members; nor is there any evidence whereby the appellant agreed to satisfy its milk requirements through purchases from the appellee or its members," we, as a court, must, and do, accept as a fact.

In connection with the above factual situation we do have, however, the established fact that Producers, Inc., did deliver quantities of milk to Isaly, and that Isaly accepted, retained possession and processed, the dairy product, and then later sold it to its customers, throughout the entire period of time— *i. e.,* from January through July, 1957. .

We are told by Isaly that there is no contract upon which suit could be maintained, because there was no meeting of the minds "upon a particular subject * * * to form a contract," no mutuality, or supporting consideration; Isaly says "it is a classic example of a nudum pactum, illusory consideration or promise."

The negotiations between the litigants, in which the price of milk was discussed by their respective officers, of course did not create a contract. There was no obligation upon either party to buy or sell. In these discussions, however, an agreement was reached upon the price of milk for a definite period if business relations were established between the companies, and milk later sold from one to the other. Producers said the agreement fixed the price per hundredweight at one figure, and Isaly said it was fixed at another figure if the retail price of milk declined; and the price of milk did decline, therefore it was obligated to pay on that basis only.

1. As heretofore noted, milk was actually delivered to and accepted by Isaly, who, in turn, sold it to the public This constituted a sale. The transaction had none of the attributes of a gift, nor is it claimed that the transaction was a gift.

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." Section 1315.02 (B), Revised Code.

In order to constitute a sale there must be (1) an agreement to sell by which alone the property does not pass; and (2) an actual sale by which the property passes. To constitute a valid sale, there must be at least the concurrence of the follow-

ing elements: viz., (a) parties competent to contract; (b) mutual assent; (c) a thing, the absolute or general property in which is transferred from the seller to the buyer; and (d) a price paid or promised to be paid.

As stated above, a sale of goods has, as one of its elements, an agreement or contract to sell. In determining whether there is a contract, exploration of the law which governs all contracts must be made, and such general principles used as the basis for a conclusion.

There are many general principles in the law of contracts from which contracts may be implied under certain circumstances without any formal expression of the will or intention of the parties. For instance: my overcoat is somewhat shabby. I speak to my bailiff, Charles H. Merwin, and say that tomorrow I may buy another coat if I find one that I like in any of the stores; and if I should buy it, I might want to sell my old coat for ten dollars. The bailiff replies by saying that, if I should decide to sell my coat tomorrow for ten dollars, he would consider buying it and would pay ten dollars if he decided to buy it; and if he bought it he would give it to the Salvation Army. It is obvious that this conversation contains none of the elements of an enforcible contract. However, if tomorrow I do buy a new coat, and then deliver the old one to the bailiff, with no comment or other conversation arising from the transaction, and the bailiff takes possession of the old coat, and, in turn, donates it to the Salvation Army as a gift from him, an implied contract immediately arises and is sufficient to justify a judgment against the bailiff for ten dollars upon his refusal to pay. The implied contract supported the sale of the coat to the bailiff for a consideration called the price, whereby the property passed from the buyer to the seller. The acceptance of the coat by the bailiff was an act which in law recognized a pre-existing contract to pay ten dollars for the coat.

Returning now to the delivery and the acceptance of the milk in the instant case. The pleadings and the evidence show beyond peradventure a sale of the milk. When Producers, Inc., delivered and Isaly accepted the delivery and took possession, an implied contract to pay the amount previously agreed upon arose. Upon each delivery, acceptance, and change of possession of the milk, an implied contract came into being, and the act

of Isaly in accepting the delivery and retaining possession for sale to third persons, was an act which acknowledged a pre-existing contract to pay the price.

From the discussion above, we mean to say that the contract forming the basis for the sale was not the preliminary agreement on price, but was the implied contract to pay a previously-agreed price when possession of the milk was transferred to Isaly. This conclusion we specifically find is not in violation of Section 1315.10, Revised Code, which provides, in part, that "price may be fixed by contract." And in this connection we state in general terms that, when a lawful transfer of property is executed, it does not matter whether the terms of a previous agreement relating to the subject matter were void or valid while executory; the transfer cannot be revoked or the terms changed. A promise to make a gift does not bind, but a gift cannot be taken back; and a transfer of property, in pursuance of a mutual agreement as to price, is not made less effective even though the agreement could not be enforced as a contract of sale. The agreement may be invalid as a contract, but if it expresses a fixed price on which the parties later deal in the delivery and acceptance of goods, the fixed price must be paid.

The pleadings and the evidence (the latter of course including the stipulation of fact) presented only one question for the jury to decide, which was, Did Producers, Inc.'s testimony correctly reflect the agreement on price, or did the testimony of the witnesses for Isaly correctly reflect the agreement?

The jury found, pursuant to proper instructions on this question, that the weight of the evidence was with Producers, Inc., as revealed by its verdict.

As heretofore indicated, we do not find this finding against the weight of the evidence, nor contrary to law.

Isaly further claims error in the admission of certain exhibits into the evidence which it asserts prejudiced its case.

That there was a conversation between the general manager of Producers, Inc., and the general manager and executive vice president of Isaly, in which the price to be paid for milk was discussed, is admitted by each litigant. They differ only over the prices which were set, in the conversation, to be paid for milk per hundredweight.

In the direct examination of the official of Producers, Inc.,

the witness stated that, following his telephone conversation with the executive officer of Isaly, he directed a letter to him, to the effect that the letter would confirm a verbal agreement "reached with your plant." The letter continued by giving the prices here claimed by Producers, Inc., to have been agreed upon. The letter was sent and received prior to the time that any of the claimed breaches occurred.

The Isaly officer on the witness stand said:

"When I received this letter it was a surprise because we never had any written contract before. We had always had verbal. We had the same contract in Canton, and Akron, and we didn't get a written contract from Canton. I had a verbal agreement, as I always had. I felt it was not necessary to pay any particular attention to it. I felt that perhaps it looked better for him to turn over to his board this kind of written notice rather than the one that he had made me verbally, and which I presumed he had made to all other dealers and which other dealers, they told me they had obtained from him, which was basically: If drop in price of milk we would go back to federal order pricing."

The witness continued by testifying that the retail price of milk dropped, after which they paid the "federal order price" in accordance with his version of the agreement.

Isaly did not answer this letter, nor did it negotiate further over the price to be paid for milk.

Similar letters were sent by Producers, Inc., to other milk processors with whom they were doing business.

These are the letters to which objection was made at the time of their introduction and admission into evidence.

It has been held in many cases that letters which are not a part of a mutual correspondence, and to which no answer is made, are not admissible in favor of the writer as evidence of the statements therein contained; and the failure to reply is not considered an implied admission by the addressee of the truth of the statements made. See annotation of cases in 8 A. L. R., 1163 et seq.

To this general statement there are many notable exceptions, and at page 1166 of the above-mentioned annotation of cases, may be found authorities for the following statement:

"Unanswered letters containing self-serving declarations may be admitted when they relate to an existing contract between the parties, though they are not a part of a mutual correspondence."

While the conversation between the officials of the litigants did not then ripen into a contract, it did relate to the price to be paid for milk, if and when milk was delivered to and accepted by Isaly. The letters were sent and received prior to the acceptance of any of the milk, the price of which is here in dispute.

It appears to this court, as was shown by the evidence in this case, that, where a letter was sent from the prospective seller of milk to the prospective buyer of the milk, which stated the sender's understanding of a price agreed to be paid, if and when milk was later sold to the buyer, and the prospective seller in its letter placed a different construction on the price agreement than did the prospective buyer, such prospective buyer's silence, before and after the consummation of a sale of the milk, was a fact for a jury to consider in determining whether the prospective buyer acquiesced in the prospective seller's construction of their agreement on price. Under such circumstances, it was the buyer's duty to speak, before any sales were consummated; and its silence became an item of evidence for the consideration of the jury in determining the terms of the contract or contracts which terminated in the sale or sales.

The jury in this case had for consideration but one question, and that was, What was the agreed price for the sale of milk?

We find no error in the submission of this question to the jury, nor in admitting the letters into the evidence.

Upon examination of each and every claim of error, we find none prejudicial to the rights of the appellant, and therefore the judgment will be affirmed.

*Judgment affirmed.*

HUNSICKER, P. J., and STEVENS, J., concur.